**UNITED STATES of America**

v.

**John W. HINCKLEY, Jr.**

**Crim. No. 81–0306.**

United States District Court, District of Columbia.

Nov. 28, 1989.

Jay B. Stephens, U.S. Atty., Robert R. Chapman, Thomas E. Zeno, John Oliver Birch, Asst. U.S. Attys., Judiciary Center, Washington, D.C., for plaintiff.

BettyJo T. Jones, Mark Lane, Washington, D.C., for defendant.

Janet Maher, Asst. Corp. Counsel, St. Elizabeths Hosp., Legal Office, Washington, D.C., for Comm'n on Mental Health Services.

Roger Pincus, Jenner & Block, Washington, D.C., for amici curiae, American Civil Liberties Union Fund of the Nat. Capital Area and the Reporters Committee for the Freedom of the Press.

Timothy B. Dyk, Patrick J. Carome, Wilmer, Cutler & Pickering, Washington, D.C., for amici curiae, Capital Cities/ABC, Inc. and The Washington Post.

## MEMORANDUM

JUNE L. GREEN, District Judge.

This matter is before the Court on defendant John W. Hinckley, Jr.'s Motion for Relief Pursuant to 24 D.C.Code § 301 and the First Amendment to the United States Constitution. Upon consideration of defendant's motion, numerous pleadings of support and opposition filed by the interested parties and *amici curiae*,[1] evidence

---

1. The Court will use the following abbreviations in referring to the pleadings considered in the course of deciding the motion:

presented at the hearing on the motion, the entire record, and for the reasons set forth below, the Court denies defendant's motion.

## I. *Background*

Defendant John W. Hinckley, Jr., has been committed to the custody of St. Elizabeths Hospital (St. Elizabeths) since August 10, 1982, pursuant to an order of the Court and 24 D.C.Code § 301(d) (1981), having been found not guilty by reason of insanity on charges relating to an attempted assassination of the President and the shooting of three other individuals. *See* Findings and Order (Aug. 10, 1982). In committing the defendant to St. Elizabeths, the Court found specifically that Mr. Hinckley suffers from a severe, chronic mental disorder and, because of the mental disorder, is dangerous to himself and others. *Id.*

Since his commitment, Mr. Hinckley has filed two motions with the Court seeking opportunities for live interviews with members of the news media—opportunities which he has been denied since 1982. Tr. I at 33–41.[2] The first motion was filed August 28, 1984. In that *pro se* motion, filed pursuant to 24 D.C.Code § 301(k), Mr. Hinckley requested, *inter alia*, "the right to be interviewed by the news media." Motion for Relief Pursuant to D.C.Code § 301(k) (Aug. 28, 1984). Judge Barrington D. Parker held a full hearing on the motion on October 4, 1984, and subsequently entered an Order in which he found "complete justification and sound reasoning" for St. Elizabeths' Policy and Procedure Directive No. 89 ("Directive 89"),[3] including its prohibition against media interviews of Mr. Hinckley. *See* Findings and Order (Oct. 10, 1984).

On August 4, 1989, defendant, by counsel, filed a Motion for Relief Pursuant to 24 D.C.Code § 301 and the First Amendment to the United States Constitution ("Defendant's Motion"). In his motion and sup-

---

Statement of Points and Authorities in Support of Defendant's Motion ("Def. Brief I");

Supplemental Memorandum in Support of Defendant's Motion ("Def. Brief II");

Memorandum of the United States With Respect to the Defendant's Motion ("U.S. Brief I");

Commission on Mental Health Services ("CMHS")'s Opposition to Defendant's Motion ("D.C. Brief I");

Response of the Defendant to the Memorandum of the U.S. and CMHS's Opposition to Defendant's Motion ("Def. Brief III");

Memorandum of Points and Authorities of *Amici Curiae* Capital Cities/ABC, Inc., and The Washington Post in Support of Defendant's Motion ("ABC Brief");

Memorandum of Points and Authorities by *Amici Curiae* ACLU Fund and Reporter's Committee for Freedom of the Press ("ACLU Brief");

CMHS Response to Motions and Memoranda of *Amici Curiae* ("D.C. Brief II");

Memorandum of the U.S. with Respect to the Sept. 20, 1989 Hearing ("U.S. Brief II");

Defendant's Post–Hearing Brief ("Def. Brief IV");

Proposed Findings of Fact and Conclusions of Law [U.S.] ("U.S. Brief III");

CMHS's Proposed Findings of Fact and Conclusions of Law ("D.C. Brief III").

**2.** The Court will use the following abbreviations in referring to the hearing transcripts:

Transcript of September 20, 1989, Hearing: "Tr. I;"

Transcript of September 25, 1989, Hearing: "Tr. II;"

Transcript of September 26, 1989, Hearing: "Tr. III."

**3.** Directive 89 reads as follows:

The purpose of this policy is to prohibit personal interviews of patients on the maximum security wards of this division by representatives of the media. This policy is being enacted based upon a concern that such interviews and publicity could adversely affect the clinical well-being and treatment progress of such patients. These maximum security patients, whose mental condition and dangerousness are such that they can only be effectively treated in the maximum security wards of John Howard Pavilion have been found to have severe mental problems and may have impaired judgment and may be unable to understand the implications of their own statements to the media. It is felt that this policy is necessary in order to preserve the integrity of patients' treatment and to prevent a disruption of the therapeutic milieu on these wards.

This policy applies to all personal interviews of a patient, (including face-to-face interviews and telephone interviews) by any representative of the media, (including radio, television and newspapers).

This policy does not prohibit patients from communicating with the media by use of the mails.

Defendant's Exhibit ("Def. Exh.") 3.

porting pleadings, Mr. Hinckley attacks Directive 89, alleging that it was promulgated solely to prevent his being interviewed by news media representatives in violation of his right of free speech guaranteed by the First Amendment to the U.S. Constitution. Def. Brief II at 2. He further argues that the directive was aimed at him specifically, and represents "disparate and prejudicial treatment," Def. Brief I at 2, in violation of the Equal Protection Clause of the Fourteenth Amendment. Def. Brief II at 7.[4] Mr. Hinckley asserts that he has recovered greatly from his diagnosed condition, and that the relief he seeks will promote his full recovery. Declaration of John W. Hinckley, Jr. (Aug. 3, 1989), at 5. "The government of the United States is seeking to silence" him, he contends, thus making him "a political prisoner." *Id.* at 4.

As relief, defendant asks the Court to find Directive 89 unconstitutional "on its face and in application," Def. Brief III at 10, and to order that St. Elizabeths permit him to be interviewed by "responsible members of the news media"[5] not more than twice a month, and at a time and place most convenient to the hospital. Def. Brief I at 3.

Defendant's positions are supported and supplemented by briefs filed on behalf of two pair of *amici curiae*, composed of Capital Cities/ABC, Inc., and The Washington Post, *see* Order (Sept. 1, 1989); ABC Brief, and the American Civil Liberties Union Fund of the National Capital Area and the Reporters Committee for Freedom of the Press, *see* Order (Sept. 19, 1989); ACLU Brief.[6] *Amici* maintain that traditional First Amendment analysis shows Directive 89 to be a content-based restriction without a sufficiently compelling governmental interest underlying it. ACLU Brief at 8–22. Even when lower standards of First Amendment review are applied to this case, they argue that the restriction proves objectionable. *See id.* at 23–29; ABC Brief at 13–19.

*Amici* add a challenge to the restriction as an abridgement of the news media and the public's First Amendment rights, alleging that it impermissibly places greater limitations on the media's access to St. Elizabeths' John Howard Pavilion ("JHP" or "John Howard") (the maximum security building) than on the general public's access to JHP, implicating the freedom of the press and principles of equal protection. ACLU Brief at 29–42; ABC Brief at 8–13.

In support of St. Elizabeths' policy, the Court has heard from both the United States and the Commission on Mental Health Services of the District of Columbia ("CMHS").[7] Both parties contend that the Court should limit its inquiry to an assessment of the reasonableness of the treatment decision reflected by the interview policy. U.S. Brief I at 5–8; CMHS Brief I at 7–9. Both maintain also that even under the applicable limited analysis, the policy passes constitutional muster. U.S. Brief I

---

**4.** Defendant also asserted, in general terms, that the directive violates constitutional due process requirements. Def. Brief III at 9–10. The Court will address this theory in tandem with the equal protection claim.

**5.** Mr. Hinckley identified initially the ABC–TV program "Prime Time" as the focus of his immediate request. Defendant's Motion at 1. At the hearing he identified The Washington Post and Barbara Walters of the ABC–TV program "20/20" as the parties by whom he would first be interviewed. Tr. I at 55. He has insisted repeatedly that he would submit only to interviews by "responsible members" of the news media. Def. Brief I at 3. The Court considers all of this irrelevant, as the issue is not *who* may interview Mr. Hinckley, but *whether* St. Elizabeths must allow him to be interviewed. A restriction aimed at preventing certain persons or organizations from interviewing a patient would be more suspect than the current regulation.

**6.** A motion by the latter *amici curiae* for litigating status was denied upon a finding that the *amici* briefs and defendant's retained counsel adequately represented defendant's interests for purposes of litigating the motion. *See* Order (Sept. 19, 1989).

**7.** On October 1, 1987, governance of St. Elizabeths was transferred from the federal government to the District of Columbia. 24 U.S.C. § 225 (1982 & Supp. V 1987). CMHS is the D.C. government agency responsible for overseeing the facility. The U.S., as the prosecuting authority, remains an interested party in this proceeding, as the defense has acknowledged. Tr. I at 19.

at 9–14; CMHS Brief I at 14–24. CMHS alleges, *inter alia*, that the entire matter is barred from reconsideration by principles of *res judicata* because of Judge Parker's October 10, 1984 ruling, CMHS Brief I at 3–6, and that the policy has been applied in a consistent manner to all JHP patients. *Id.* at 25–26.

Pursuant to 24 D.C.Code § 301, the Court conducted an evidentiary hearing on the matter on September 20, 25 and 26, 1989.[8] At the outset of the hearing, the U.S. urged the Court to deny the motion summarily and to forego a full hearing,[9] Tr. I at 3–5; *see also* U.S. Brief II at 1–2, and CMHS endorsed that position. Tr. I at 23. However, defense counsel persisted in demanding a hearing, proposing to "demonstrate that St. Elizabeth's [sic] Hospital . . . is not an objective, scientific organization, but is engaged in a vendetta against Mr. Hinckley." Tr. I at 6. The Court informed the defendant that such a hearing would be possible only if he were to waive his doctor-patient privilege and right of confidentiality as to matters implicated by the doctors' sealed reports and his sealed court and medical records. Tr. I at 12–20. This was necessary because the treatment justification upon which the government intended to rely in rebuttal of the defense theory and in support of Directive 89, as set forth in the government parties' pleadings, would require reference to records of Mr. Hinckley's treatment and confinement at St. Elizabeths. While not encouraging him to do so, the Court inquired as to whether Mr. Hinckley was willing to sacrifice his privacy for the sake of the motion. Tr. I at 12–20. After conferring with counsel, the defendant elected to waive his privilege and proceed.[10] Tr. I at 20–21. The resulting hearing consisted of the testimony of Mr. Hinckley and Dr. Raymond F. Patter-

son, the Administrator of Forensic Services of CMHS, as well as the presentation of documentary evidence by the defense and CMHS. Written closing arguments were submitted subsequently by Mr. Hinckley, CMHS and the U.S.

## II. *Findings of Fact*

Mr. Hinckley testified in his own behalf in a calm and seemingly straightforward manner. He presented evidence that members of the treating staff at John Howard Pavilion had recommended, within the last two years, that he be placed in a less secure environment. *See* Def. Exh. 11. He noted that he had resided on a medium security ward at John Howard for several months in 1988, but that the balance of his commitment has been spent on various maximum security wards of the facility. Tr. I at 26–27; Def. Exh. 12. He cited the fact that he had not been on psychotropic medication for over three years, Tr. I at 25, and that he had "not been obsessed, fixated, preoccupied with [Jodie Foster (the subject of his obsession at the time of the shootings)] in five, six years." Tr. I at 92. Mr. Hinckley asserted that he has not violated Directive 89 since its inception in 1982, and has only rarely attempted to communicate with reporters through the mails, as the directive allows. Tr. I at 33–35. Explaining his desire to be interviewed by members of the news media, he insisted that his case is "unlike the other cases at John Howard Pavilion," requiring him to "have to deal with public opinion as far as [his] eventually getting out of the hospital, unfortunately." Tr. I at 56. His goal is to gain the attention of someone "not part of the hospital treating team or in any way associated with the government" who would be "impartial." Tr. I at 55.

---

**8.** The Court also ordered CMHS to produce for the Court all of its records relating to the defendant, *see* Order (Sept. 19, 1989), and received in response all CMHS records generated or received since the last such request in 1987.

**9.** Section 301 permits the Court to decide a motion summarily if "the files and records of the case conclusively show that the person is entitled to no relief." 24 D.C.Code § 301(k)(3).

**10.** In response to the defendant's waiver of privilege, the U.S. sought an order unsealing documents dating since April 1987. Tr. II at 150. The Court determined that *only* documents offered as exhibits or evidence in the course of this proceeding, though under prior sealing orders or otherwise privileged, would be unsealed as a result of Mr. Hinckley's waiver. *See id.;* Order (Sept. 26, 1989).

The sole witness called by the government parties [11] was Dr. Raymond F. Patterson, who has been Forensic Services Administrator of the Commission on Mental Health Services since 1987. Prior to that position, Dr. Patterson was the medical director of the John Howard Pavilion from 1983 to 1987. Tr. I at 96–97. From December 1983 to March 1989, Dr. Patterson served as Mr. Hinckley's family therapist, Tr. I at 100, and since 1983 he has been a member of Mr. Hinckley's treatment team. Dr. Patterson's experience and credentials are in the fields of general psychiatry and forensic psychiatry. He is thoroughly qualified in each specialty and his expertise in the treatment and diagnosis of mental illness was accepted by all parties and the Court. Tr. I at 100.

Dr. Patterson testified that Mr. Hinckley's current diagnosis is psychotic disorder, not otherwise specified (as per the "Diagnostic and Statistical Manual III, revised"); major depression, recurrent, presently in remission; and narcissistic personality disorder, which is the predominant feature. Tr. I at 106. This personality disorder is characterized by "a tremendous sense of entitlement," or grandiosity, which is a symptom of narcissism. Tr. I at 106–07.

Explaining the manifestation of this disorder in Mr. Hinckley, Dr. Patterson stated that at no time before or after the assassination attempt has Mr. Hinckley appeared to be a "raving," violent or drug dependent person; rather, the defendant appears calm and unremarkable in the John Howard environment. Tr. I at 105; Tr. II at 68–69. Dr. Patterson observed that it is difficult to determine what is truly going on within Mr. Hinckley's mind. The history of Mr. Hinckley's treatment suggests that this determination can be made through hindsight, as evidence of past thoughts emerges from the patient's writings or actions. Tr. I at 68–69; Tr. II at 33. In sum, the doctor found Mr. Hinckley to be "severely mentally ill" at the time of the hearing. Tr. I at 105.

As a current example of Mr. Hinckley's narcissistic impulse, Dr. Patterson noted the defendant's preoccupation with presenting his case to the American public, rather than pursuing the appropriate legal channel to his release, a section 301 motion to the Court. Tr. I at 106–07. In the past, the disorder has been reflected by a pattern of "selective memory" by which Mr. Hinckley seeks to avoid confrontation with the truth of past events. Tr. I at 108. The treating physicians are uncertain whether to characterize this behavior as delusion or deliberate lying, but Dr. Patterson maintained that the habit was evident even in Mr. Hinckley's response to cross-examination at the hearing. Tr. I at 108–09.

The only pertinent medical evidence presented by the defense [12] was a February 12, 1987, letter report directed to Mr. Joseph Henneberry, then Director, Division

---

**11.** The CMHS originally planned to call Dr. David M. Powell, the Director of Inpatient Services for the Forensic Services Administration, to testify, as well. Tr. I at 123. They later decided not to call him, perhaps because the Court already had the benefit of two affidavits expressing Dr. Powell's views of the defendant's condition. See Affidavit of David M. Powell (Sept. 8, 1989); Affidavit of David M. Powell (Sept. 15, 1989).

**12.** Much of the defense's efforts were directed at impeaching Dr. Patterson for, among other things, not disclosing to Mr. Hinckley and the defendant's parents that the doctor was serving as a consultant to the United States Secret Service from 1982 to 1986—the same time at which he was working with the Hinckley's as their family therapist. See, e.g., Tr. II at 81–85. The Court does not find this fact to mitigate the strength of the doctor's testimony or the quality of the defendant's treatment. However, the Court does note that the defendant's relationship with Dr. Patterson deteriorated during the last year and led to the Hinckleys' termination of family therapy sessions. Tr. III at 65–68. Because, as Dr. Patterson has noted, the therapeutic alliance of trust is critical to successful therapy, Tr. II at 34, the Court expects that St. Elizabeths will take appropriate steps immediately to ensure that the defendant has access to family therapy with a therapist acceptable to the Hinckleys.

The Court is happy to note that at no time has there been interruption of Mr. Hinckley's individual therapy, which is conducted by a physician well-regarded by the defendant, Tr. III at 65–66, and who is known as among the finest psychotherapists in the country. See Tr. II at 110.

of Forensic Programs, St. Elizabeths Hospital, by Glenn H. Miller, M.D. *See* U.S. Exh. 1. Dr. Miller is a private psychiatrist who examined Mr. Hinckley at the hospital's request in January and February 1987. In addition to his examinations of the patient, Dr. Miller reviewed the medical charts and interviewed the doctors and ward attendants. U.S. Exh. 1 at 1. The last contact between Dr. Miller and Mr. Hinckley prior to preparation of this report was in 1982 when the doctor served as a member of an examining team preparing a determination for the *Bolton* hearing. *See* U.S. Exh. 1 at 1.

Dr. Miller's letter report indicates that in 1987 he found Mr. Hinckley to be considerably improved, having made "steady and continuing progress" since 1983. U.S. Exh. 1 at 3. The doctor found this to be particularly true because Mr. Hinckley had been "free of" his "preoccupation" with Jodie Foster "for at least three years;" in fact, Dr. Miller wrote, the defendant had described his former thoughts as "silly," and his behavior as "living in a fantasy." U.S. Exh. 1 at 1. In addition, Mr. Hinckley was enjoying a normal relationship with a former St. Elizabeths patient, who is now his fiancee. U.S. Exh. 1 at 6. The report notes that ward staff considered Mr. Hinckley "one of the best functioning patients on the ward," *id.* at 4–5, and that he considered the patient's psychosis and depression to be in remission. *Id.* at 8. Despite his findings that Mr. Hinckley was not displaying psychotic-like features, had no grandiose preoccupations, no longer needed to be "the center of attention" and was "presently quest[ing] anonymity," Dr. Miller still felt it appropriate, albeit to a diminished extent, to diagnosis Mr. Hinck-

ley's illness as narcissistic personality disorder. *See* U.S. Exh. 1 at 8.

Three factors weigh heavily in the Court's consideration of Dr. Miller's report. First, the report was two and a half years old at the time of the hearing. That means it lacked information and insights developed during the last quarter of Mr. Hinckley's total commitment period. Both common sense and the radical changes in Mr. Hinckley's condition over similar previous periods in this overall timespan (as noted in Dr. Miller's own report) indicate that such a deficiency is fatal to the reliability of the report and its opinions.

Second, it is obvious that Dr. Miller's report and the conclusions it expresses were created in the absence of full knowledge of Mr. Hinckley's thoughts and behavior during the period covered. Letters written by Mr. Hinckley during that time and thereafter and articles recovered from his room not long after the report date reflect Mr. Hinckley's habit of retaining dozens of photographs of Ms. Foster, some nude, and regularly seeking more of them, indicating a continued intense interest in the actress. *See* Def. Exh. 15 (April 1986 request for photos); D.C. Exh. 3 (May 1988 acknowledgment of photos and request for more); D.C. Exh. 2 (June 1988 acknowledgment of "CARE package"); Tr. II at 52 (April 1987 court-ordered search of defendant's room yielded 57 photographs of Miss Foster). Many letters from this time also reflect extremely self-centered and grandiose views and plans for the future of Mr. Hinckley and his "followers," in stark contradiction to the facade perceived and reported by Dr. Miller. *See* D.C. Exhs. 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15.[13] As a result,

---

**13.** These letters by the defendant, dated June 1985 to August 1987, detail his plans for his "family," "cult," "movement" or "nation within a nation" and set forth various ideas and fascinations quite different from those expressed by the patient described in hospital records and Dr. Miller's report. For example, Mr. Hinckley described himself in 1986 as the "successor," to Hitler, D.C. Exh. 15, whom the defendant viewed as "a prophet." D.C. Exh. 14. The defendant linked Hitler and Charles Manson as part of a continuum, D.C. Exh. 15, and attempted as recently as June 1988 to convey word to

Manson that "he's one cool dude" and also someone Mr. Hinckley views as "a prophet." D.C. Exh. 2. (When questioned about this interest in Manson, Mr. Hinckley described it as being no greater than that of the general public. Tr. I at 93.) All the while, his level of residential security was being relaxed and his privileges increased on the basis of an incomplete appraisal of his progress and intentions. This irony and Mr. Hinckley's understanding of the need to project the right image to the staff is reflected in a December 1985 letter in which he notes that his "perfect" hospital record for the

the Court cannot credit the dated and ill-founded conclusions which Dr. Miller's report announces.

In fact, this contrast is the very reason why Dr. Miller's report is significant. The fact that Mr. Hinckley misled Dr. Miller and the ward staff about his inner feelings, interests and activities is fully consistent with the diagnosis set forth by Dr. Patterson. On the surface, Mr. Hinckley appeared well and fully recovered from his past preoccupations and delusions. Inside, he was protecting and concealing completely opposite attitudes, thoughts and fantasies.

The Court finds that Mr. Hinckley deliberately tried to mislead the psychiatric staff and Dr. Miller about his true feelings with regard to Ms. Foster and other issues relevant to his treatment and, indeed, was successful in doing so before the U.S. Secret Service obtained some of his correspondence from the addressees and delivered it to the U.S. Attorney's office. Tr. I at 110–11.

Dr. Patterson's explanation of how Mr. Hinckley's letters matched the diagnosis was reasonable and convincing. Since the very moment of his arrest for the shooting, Mr. Hinckley has been obsessed with the media's coverage of his thoughts and deeds, his first inquiries at the police station having been " 'where is the media? where is the press?' " Tr. II at 67. *See also* Tr. I at 113; Tr. II at 62, 68, 119. The initial diagnosis of narcissism and grandiosity has been borne out by his letters and pattern of concealment, despite intermittent assessments of his outwardly improved behavior. Though Mr. Hinckley's condition may have improved or abated at times over the years, substantial evidence supports Dr. Patterson's view that the instant motion is further proof that the patient's grandiose delusions and media fixation continue at this time. Tr. II at 68–69. His view that the approval of Mr. Hinckley's request would be harmful to the defendant's therapy is a reasonable treatment decision.[14]

The Court further finds that Directive 89, as applied to the defendant, is based on reasonable and legitimate institutional concerns. These concerns include orderly administration of the facility, security of patients, visitors and staff, and the therapeutic interests of all patients. Tr. II at 61.

Security concerns center on numerous threats received against both the defendant and those who have treated him. Tr. II at 64; Affidavit of David M. Powell ¶ 5 (Sept. 18, 1989). *See, e.g.*, CMHS Brief II Exhibits. These threats tend to increase in response to media attention to the defendant's treatment. Affidavit of David M. Powell ¶ 5 (Sept. 18, 1989). The general security of the facility and control of contraband is also made more difficult by increased access to persons not otherwise approved. *Id.* at ¶ 4.

Administrative concerns include the strain on St. Elizabeths' resources and staff in accommodating the special arrangements required by interviews. Tr. II at 64–65; Affidavit of David M. Powell ¶ 9 (Sept. 8, 1989); Affidavit of David M. Powell ¶ 7 (Sept. 18, 1989). Such interruptions

---

previous year should earn him increased privileges, and then adds: "I am a prophet and there is power in everything I do." D.C. Exh. 14.

The defendant's desire to conceal and obscure the truth of his feelings and behavior surfaced again in 1988 when the room search produced photographs indicative of a sustained interest in Ms. Foster. Confronted with the discovery, Mr. Hinckley lied about the nature of the photographs out of what he described as an attempt "to make the best of that particularly bad situation." Tr. I at 92–93. *See also id.* at 113.

**14.** The defendant's desire for such interviews derives from a belief that he will be able to control the questioning and produce an impression favorable to him, resulting in public pressure which will accelerate his release. *See* Tr. I at 55–56. The Court finds that such a desire ignores the very real dangers to him of such publicity. The clinical concerns underlying the policy include the adverse effect upon his condition that probing interviews conducted by competent and experienced interviewers might have on his condition; the stress of an interview could produce negative clinical effects. Tr. II at 59, 61–62. Mr. Hinckley has indicated in the past that contacts he has made with media representatives have been detrimental and regrettable. Tr. I at 112. Further, his statements might jeopardize not only his recovery but that of other patients, as well. Tr. II at 61–64.

in the normal and intended atmosphere of the facility might invade the privacy of other patients and certainly could damage the therapeutic milieu the staff strives to foster. Tr. II at 65; Affidavit of David M. Powell ¶¶ 6, 7 (Sept. 18, 1989); Affidavit of David M. Powell ¶ 10 (Sept. 8, 1989).

Directive 89 was adopted in response to these concerns and with attention to the need to preserve some means of patient's exercising their exercising First Amendment rights. Tr. II at 60. It allows patients the use of mailed correspondence to maintain completely uncensored contact with the news media. Def. Exh. 3; Tr. II at 54, 59–60. Mr. Hinckley has availed himself of this opportunity more than 50 times over the past seven years. Tr. II at 65–66. At least one of these contacts has been in the form of a lengthy interview, see U.S. Brief I Appendix C (March 1983 *Penthouse* magazine interview); another has been in the form of an essay submitted for publication, see Tr. I at 34 (defendant's account of article submitted to *The New Republic* magazine).

The policy underlying Directive 89 has been in effect for twenty years and treats all patients in maximum security [15] at John Howard equally; it does not single out the defendant. Furthermore, the evidence indicates that it has been enforced in a consistent manner during the time of Mr. Hinckley's commitment. See Affidavit of David M. Powell ¶ 4 (Sept. 8, 1989); Affidavit of Joseph Henneberry ¶ 5 (Aug. 25, 1989); Tr. II at 60. The policy is also consistent with the general restriction of access at John Howard to specific, identified persons; the general public does not have a right of entry at the facility. Tr. II at 55.

### III. *Conclusions of Law*

This motion and the issues it has raised present a dilemma for the Court. They

appear to pit the state's interest in privately rehabilitating persons adjudicated "insane" against the constitutionally protected rights of the individual "to speak," the media "to report" and the public "to know." The issues, however, are neither that simple nor that broad. The true contest balances the state's duty to treat the criminally insane against the patient's right to exercise his constitutional rights to the fullest extent of his legally diminished capacity.

### A. Threshold Issues

#### 1. *The Res Judicata Issue*

■ The Court rejected CMHS' *res judicata* argument and proceeded with a full evidentiary hearing. The reasons require little discussion and are endemic to the nature of the two proceedings.

The doctrine of *res judicata* binds the parties to a suit to a final determination of the claims, and precludes relitigation of any ground for relief which they have already had an opportunity to litigate—even if the ground was not raised in the earlier proceeding. *Hardison v. Alexander*, 655 F.2d 1281, 1288 (D.C.Cir.1981). The 1984 motion to which CMHS would apply this doctrine was filed *pro se* by defendant. While CMHS has cited authority suggesting that even *pro se* litigants are encompassed by the scope of this doctrine, the unique context of a *pro se insanity acquittee* substantially dilutes the force of that argument.[16]

CMHS also notes that, while the defendant did not include a First Amendment claim in his 1984 motion, the government did brief that issue and, thus, the Court was aware of the claim in making its ruling. That argument might have merit if

---

**15.** There are three levels of security in the various wards of John Howard Pavilion: maximum, medium and minimum. Maximum security is reserved for the most severely ill and/or the most dangerous patients. See Tr. II at 44; Affidavit of David M. Powell ¶ 8 (Sept. 8, 1989). The Court finds from the total evidence presented that there is a valid basis for Mr. Hinckley's placement at the present time on a maximum security ward.

**16.** CMHS also notes that Mr. Hinckley was assisted at the 1984 motion hearing by his then-counsel. CMHS Brief I at 3; see Transcript of Oct. 4, 1984, Hearing at 27–31. That fact does not alter the fact that the defendant filed his pleading without legal assistance, as reflected by its skeletal form and lack of authority, and as noted by counsel at the hearing. Tr. at 6 (Oct. 4, 1984).

the order entered by the Court referred to the constitutional scope of its findings. To the contrary, the Court cited only 24 D.C. Code section 301(k) as the authority for defendant's motion, suggesting that the issue was decided on that basis alone. *See* Tr. at 33–34 (Oct. 4, 1984); Findings and Order (Oct. 10, 1984). As a consequence, that ruling fails the "final order" requirement of the *res judicata* doctrine, since § 301 entitles defendant to a review of any renewed claims for relief every six months. *See* 24 D.C.Code § 301(k)(5).

### 2. The Rights of the Public and the News Media

■ The Court granted the two motions for leave to file *amici curiae* briefs in this matter as a means of supplementing the defendant's briefing of the issues, especially in view of the dearth of direct authority on the central issue of this motion. However, both pair of *amici* devoted large segments of their submissions to arguing the invalidity of Directive 89 as an infringement on the news media and general public's First Amendment right to a free press—an issue not raised by the defendant, and one which, in any event, he would not have standing to raise. *See* ABC Brief at 8–13; ACLU Brief at 29–41.

■ The U.S. and CMHS made clear their position that the role of *amici* is limited to illuminating the issues before the Court, not adding positions which advocate *amici*'s own, non-party interests.[17] Thus, the government parties argue, *amici* may not transform this action into a class action on behalf of all John Howard residents or a civil rights action on behalf of media representatives when neither of those features has been generated through proper process. The Court agrees, and will not address the freedom of the press arguments since they are beyond the scope of this proceeding and are not squarely presented by a party to the action.[18] *Compare Pell v. Procunier,* 417 U.S. 817, 819–21, 94 S.Ct. 2800, 2802–04, 41 L.Ed.2d 495 (1974) (media rights issue raised properly where media representatives were party to the action).

### B. Defendant's First Amendment Claim

#### 1. The Standard of Review

It is well-established that persons committed to state institutions through involuntary procedures do not surrender all of their constitutionally guaranteed civil rights. *See, e.g., Thornburgh v. Abbott,* —— U.S. ——, 109 S.Ct. 1874, 1878, 104 L.Ed.2d 459 (1989) (quoting *Turner v. Saf-*

**17.** The U.S. noted that the *amici* would need to gain intervention before they might interpose such new, independent interests. U.S. Brief I at 2–3 n. 4. CMHS was more vocal in its response, accusing the *amici* of "a disgraceful attempt, for [*amici's*] own purposes, to expand this matter far beyond the narrow issue before the court," CMHS Brief II at 1, in order to serve their true, unstated interest: "the creation of a highly sensational news story and front-page publicity from which [*amici*] may benefit, but from which Mr. Hinckley will not." *Id.* at 4 n. 2.

**18.** The Court notes that the *amici* have framed the media rights issue inaccurately. Both *amici* and the government parties base their arguments on the Supreme Court's holding that "[n]ewsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public." *Pell,* 417 U.S. at 834, 94 S.Ct. at 2810 (1974). Drawing an analogy between prisoners and insanity acquittees as both being involuntarily committed to state control, *amici* conclude that this and related holdings require the state to provide the news media general access to St. Elizabeths. This conclu-

sion requires the predicate assumption that *the public* enjoys a general right of access to St. Elizabeths and its residents. The government parties cite the *Pell* holding for the *opposite* conclusion, noting that the general public *does not* have a right of free access to St. Elizabeths; rather, select individuals have access privileges, and monitoring organizations have access on a periodic basis. CMHS Brief II at 22 and Affidavit of David M. Powell ¶ 8. Such a rule is consistent with a policy conclusion, among others, that "[i]nmates in jails, prisons or mental institutions retain certain fundamental rights of privacy; they are not like animals in a zoo to be filmed and photographed at will by the public or by media reporters, however 'educational' the process may be for others." *Houchins v. KQED, Inc.,* 438 U.S. 1, 5 n. 2, 98 S.Ct. 2588, 2592 n. 2, 57 L.Ed.2d 553 (1978). The analogy to the prison context would then beg application of the Supreme Court's finding that restrictions on news media access which are no more onerous than those imposed on the general public do not implicate the freedom of the press. *See Saxbe v. Washington Post Co.,* 417 U.S. 843, 849–50, 94 S.Ct. 2811, 2814–15, 41 L.Ed.2d 514 (1974).

*ley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987)); *Wolff, Warden, v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974) (all in context of criminal prisoners); *see also Davis v. Balson,* 461 F.Supp. 842, 864–65 & n. 14 (N.D.Ohio 1978) (three judge panel); *Wyatt v. Stickney,* 344 F.Supp. 373, 379 (M.D.Ala.1972), *aff'd in part, rev'd in part and remanded,* 503 F.2d 1305 (5th Cir. 1974) (both in context of involuntary mental patients). It also is clear that the state may abridge certain rights of persons institutionalized under its control in order to serve certain predominating governmental interests. *E.g., Pell,* 417 U.S. at 822, 94 S.Ct. at 2804 (prison context). *See also Jones v. United States,* 463 U.S. 354, 361–62, 103 S.Ct. 3043, 3048, 77 L.Ed.2d 694 (1983); *Davis,* 461 F.Supp. at 864, 866–67 (both in mental institution context). However, none of the parties have been able to cite authority which articulates the law on the narrow issue before the Court: to what extent may the state infringe upon the First Amendment free speech rights of an insanity acquittee in a state mental institution who desires to communicate directly with the news media, and what is the level of scrutiny required of a reviewing court examining a policy with such an effect. A review of existing authority addressing related issues in both the prison and mental health contexts indicates that the two converge to produce a test applicable to the institutional restrictions on defendant's asserted rights.

### a. Restrictions Imposed through "Treatment Decisions"

■ The government parties argue that the Court need not even address the constitutional implications of the defendant's claims because the restrictions to which he has been subjected were made in furtherance of his treatment and relate essentially to the internal administration of the hospital, thus meriting a high level of deference by the reviewing court. *See Dixon v. Jacobs,* 427 F.2d 589, 597 (D.C.Cir.1970); *Covington v. Harris,* 419 F.2d 617, 621 (D.C. Cir.1969).[19] In such a situation, the court is required to determine not whether the hospital has made the "best" decision, but merely whether it "has made a permissible and reasonable decision in view of the relevant information within a broad range of discretion." *Tribby v. Cameron,* 379 F.2d 104, 105 (D.C.Cir.1967), *cited in Dixon,* 427 F.2d at 597–98. *See also Youngberg v. Romeo,* 457 U.S. 307, 320–22, 102 S.Ct. 2452, 2460–61, 73 L.Ed.2d 28 (1982) (state treatment of involuntarily committed mentally retarded persons which implicates due process interests will be reviewed only to determine whether a reasonable treatment decision has been made through an exercise of professional judgment).

■ While the *Tribby* standard may be the appropriate measure in most section 301(k) motions, the Court finds that it is an inadequate device for a challenge based in large part on the constitutional dimensions of a particular policy or decision.[20] There-

---

**19.** *Amici* ACLU and the Reporter's Committee for Freedom of the Press argue that even if the decision is characterized as a treatment decision, defendant's rights are unconstitutionally abridged because he is entitled to make such decisions for himself. *See* ACLU Brief at 12–15. The Court finds the authority noted by *amici* to be inapposite, and holds that both the purposes of his confinement and the asserted interests of CMHS justify limitation of defendant's role in making certain treatment decisions. Thus, this argument does not control the Court's determination.

**20.** The few previous First Amendment cases cited in the pleadings which involve insanity acquittees alternatively support both the conclusion that deference to professional judgment is merited in these cases and the conclusion that prisoners' rights First Amendment analysis ap-

plies. *Compare Davis v. Watkins,* 384 F.Supp. 1196, 1207–08 (N.D.Ohio 1974) ("Patients' right to communication shall not be prohibited *except to the extent that the qualified mental health professional responsible for the formulation of the patient's treatment plan writes an order imposing special restrictions ...*") (emphasis added) *and Wyatt,* 344 F.Supp. at 379 ("Patients shall have the same rights to visitation and telephone communication as patients at other public hospitals, *except to the extent that the Qualified Mental Health Professional responsible for formulation of a particular patient's treatment plan writes an order imposing special restrictions.*") (emphasis added), *with Davis,* 461 F.Supp. at 864–65 (applying the prevailing prisoner's constitutional rights analysis to determine First Amendment rights of insanity acquittees in general communication context) (this

fore, in situations where there is no direct authority validating the constitutionality of the basic intrusion generated by a challenged policy, the Court holds that a higher level of scrutiny is required than that assigned to mere treatment decisions.

### b. Constitutional Intrusions in the Prison Setting

The Supreme Court, confronted in the recent past with numerous challenges to prison regulations, has validated the government's authority to restrict certain constitutional freedoms in furtherance of institutional goals. Through tests of regulations curtailing prisoners' First Amendment rights to uncensored personal correspondence, *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), face-to-face media interviews, *Pell*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), unrestricted receipt of publications, *Abbott*, — U.S. —, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and unlimited correspondence with other inmates, *Turner*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Court has crafted a standard for assessing the sufficiency of governmental justification for these infringements: when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261, *quoted in Abbott*, 109 S.Ct. at 1876.

In making this determination, the Court has identified several guiding considerations. First, there must be a " 'valid, rational connnection' " between the prison regulation and the asserted legitimate governmental interest, *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261–62 (quoting *Block v. Rutherford*, 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984)), such that the regulation is not "arbitrary or irrational." *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2262. Second, the presence of alternative means of exercising the asserted right will underscore the need for judicial deference to institutional officials. *Id.* at 90, 107 S.Ct. at 2262. Third, the impact that accomodation of the asserted right will have on prison staff and other inmates requires attention, especially when the "ripple effect" on those other parties will be "significant." *Id.* Fourth and finally, the absence of ready alternatives is evidence of the reasonableness of the regulation, while the presence of "obvious, easy alternatives" (though *not* necessarily the "least restrictive alternative") may lead to the conclusion that the regulation is an "exaggerated response" to prison concerns. *Id.*[21]

### c. The Prisoner—Insanity Acquittee Analogy

The government parties urge the Court, if it determines that a full constitutional analysis must be done, to apply the *Abbott* and *Pell* standards recited above.[22] Noting that the mental health and prison settings both are areas characterized by a need for unique professional expertise and that both types of confinement raise important common governmental concerns, they argue that extension of the Supreme Court's high level of deference to institutional expertise and decisionmaking is warranted in this context.[23] To concur, the Court must find that the *Pell* and *Abbott* standards sufficiently encompass concerns peculiar to the

---

opinion being a final order following the interim order issued in *Davis v. Watkins* ).

**21.** This last element echoes the Court's earlier holding that similar restrictions would be upheld absent "substantial evidence in the record to indicate that the officials have exaggerated their response" to the asserted considerations. *Pell*, 417 U.S. at 827, 94 S.Ct. at 2806.

**22.** Application of the *Abbott* standard also is supported by *amici* ABC, Inc., and The Washington Post. *See* ABC Brief at 14–15.

**23.** In fact, they suggest that such an application is contemplated by the Supreme Court's prison case holdings. *See* CMHS Brief IV at 15, citing *Houchins*, 438 U.S. at 14, 98 S.Ct. at 2596 (Supreme Court rejects notion of a public and media "right to government information regarding the conditions of jails and their inmates and presumably all other public facilities such as hospitals and mental institutions").

nature of insanity acquittees' conditions of confinement to justify such an application.

Defendant argues that the *Pell* and *Abbott* standards may not be applied to him since the prison setting features a penal element which is impermissible in the commitment of insanity acquittees. Persons committed to St. Elizabeths following an acquittal by reason of insanity have not been convicted of a crime, and thus may not be punished. *Jones*, 463 U.S. at 368–69, 103 S.Ct. at 3051–52. The twin purposes of such a person's confinement are to treat the person's mental illness and to protect the person and society from the person's potential dangerousness. *Id.* at 368, 103 S.Ct. at 3051.[24]

■ The Court acknowledges the nonpenal nature of defendant's confinement, but also notes that it is not a commitment unrelated to the criminal justice process.[25] The prerequisite to the defendant's section 301 commitment was a jury finding, beyond a reasonable doubt, that the defendant had committed a criminal offense. *Jones*, 463 U.S. at 363–64, 103 S.Ct. at 3049. Such a finding triggers treatment of the judgment in a manner consistent with other criminal verdicts for purposes of double jeopardy and *ex post facto* protections. *See, e.g., Anderson v. Dep't of Health & Mental Hygiene*, 310 Md. 217, 528 A.2d 904, 907–11 (1987) (nature of insanity acquittee's confinement and the process by which it is rendered implicate *ex post facto* prohibition), *cert. denied*, 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988). As a consequence of this finding, the defendant may be confined for an indefinite period of time, possibly far longer than he would have been detained pursuant to a criminal conviction. *Jones*, 463 U.S. at 368–69, 103 S.Ct. at 3051–52.

The purposes of an insanity acquittee's confinement are similar to those underlying the detention of criminal convicts, with the notable exception of the penal element. Criminal convicts are imprisoned to serve social interests in retribution, deterrence and rehabilitation, *id.*, as well as the protection of society. *Pell*, 417 U.S. at 822–23, 94 S.Ct. at 2804. This array of governmental purposes led the Supreme Court in *Pell* to uphold a regulation similar in effect to Directive 89 as being consistent with the legitimate objectives of the corrections system. *Id.*

In assessing the challenged limitation on First Amendment protected speech, this Court cannot refer to penal considerations, as the *Pell* Court did for the prison context. However, the level of governmental interest noted by the *Pell* and *Abbott* courts is paralleled in the insanity acquittee context by additional, compelling factors which substitute for the absent penal considerations. Chief among these additional factors is the special nature of the "legitimate governmental interest in ... rehabilitating mental patients." *Jones*, 463 U.S. at 362, 103 S.Ct. at 3048 (quoting *Jones v. United States*, 432 A.2d 364, 371 (D.C. 1981)). In this area "fraught with medical and scientific uncertainties" courts should be loathe to interfere with the necessarily broad options afforded institutional officials by enabling legislation. *Jones*, 463 U.S. at 370, 103 S.Ct. at 3052 (quoting *Marshall v. United States*, 414 U.S. 417, 427, 94 S.Ct. 700, 706, 38 L.Ed.2d 618 (1974)). Such concerns have led courts to "show deference to the judgment exercised by a qualified professional" in related mental health contexts, *Youngberg*, 457 U.S. at 322, 102 S.Ct. at 2461, based on the belief that psychiatrists are better qualified than

---

24. In other words, the legitimate governmental interests at issue are the protection of society and the rehabilitation of the mentally ill. *Id.* 463 U.S. at 362, 103 S.Ct. at 3048. Therefore, the committed person is entitled to release when he has recovered his sanity and is no longer dangerous. *Id.;* 24 D.C.Code § 301(e).

25. The Supreme Court has noted "the widely and reasonably held view that insanity acquittees constitute a special class that should be

treated differently from other candidates for commitment." *Jones*, 463 U.S. at 370, 103 S.Ct. at 3053 (footnote omitted). The reality of past "anti-social conduct" by such persons led our Court of Appeals to term them "an exceptional class of people" whom Congress has determined "pose a significant risk to the community...." *United States v. Ecker*, 543 F.2d 178, 197 (D.C. Cir.), *cert. denied* 429 U.S. 1063, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977).

judges to render psychiatric judgments. *Parham v. J.R.*, 442 U.S. 584, 607, 99 S.Ct. 2493, 2506, 61 L.Ed.2d 101 (1979).

■ The Court will apply to defendant's claim a test informed by the *Tribby* respect for judgments of mental health professionals, but fashioned after the more refined and heightened reasonableness inquiry prescribed by the *Pell* and *Abbott* courts, with due regard for the competing interests involved in such restrictions upon constitutional rights. The ultimate determination will be whether the regulation is reasonably related to legitimate therapeutic and institutional interests in the narrow context of commitment of insanity acquittees.

### 2. The Directive "As Applied" to Defendant

The criteria set forth by the *Turner* and *Abbott* courts [26] provide a framework for application of this standard to the present case. In satisfaction of the first and, perhaps, most important of these factors, there is a clear, valid and rational connection between Directive 89 and the asserted governmental interest. Dr. Patterson's testimony and related exhibits established that the defendant's narcissistic personality disorder is particularly vulnerable to reinforcement through media contact, resulting in exacerbation of his illness generally.[27]

Weighing heavily in favor of the directive's constitutionality is the availability of an alternative means of exercising the asserted right: the written medium. The evidence established that Mr. Hinckley will be permitted to conduct full and uncensored interviews through correspondence, and that he has done so on at least one occasion in the past.[28] In response, he indicates simply that this medium is not sufficient for his purposes. However, the Supreme Court found it to be of critical

importance in *Pell*, where the presence of the written alternative not only diminished the Court's concern over restriction of prisoners' First Amendment rights, but reinforced the government's assertion that the restriction related not to the content of the speech but to other considerations surrounding the desired interviews. 417 U.S. at 824–25, 94 S.Ct. at 2805.

The Court finds less compelling, but genuine nonetheless, St. Elizabeths' assertion that administrative and security concerns figure substantially in the determination. It is true that a sudden deluge of requests for interviews by all patients governed by Directive 89, or all patients generally, would wreak havoc with the administration of the facility. The likelihood of such a development, however, is slight. More distressing is the significant damage routine interviews of patients could create to the therapeutic milieu (including the privacy interests of patients), relationships between patients and each other, and relationships between patients and staff. In this sense, the Court perceives a grave hazard in the "ripples" resonating from even a single unadvised departure from the current policy.

Finally, ready alternatives to Directive 89 which would achieve the asserted goals of that regulation are not available. It is not necessary that the regulation employ the least restrictive means of attaining its goals. It is also not clear that, as applied to Mr. Hinckley, Directive 89 is not itself the least restrictive means available; indeed, if the treatment team's fears about the impact of such interviews upon Mr. Hinckley are accurate, and the Court concludes they are, then any less restrictive device would allow aggravation of the pa-

---

**26.** As set forth above at page 627.

**27.** In fact, this problem appears far more potent in the case of a patient suffering Mr. Hinckley's affliction than it might in different mental disorders, begging the question of how well Directive 89 may be applied to patients not joined in this action but subject to the regulation. *See*

Declaration of Robert K. Madsen ¶ 13 (Aug. 31, 1989).

**28.** The Court notes that the defendant's effective and responsible employment of this means to express his purported message would be helpful not only to him in achieving his goals, but also to the treatment team in appraising the defendant's condition, progress and prognosis.

tient's illness. The Court will not endorse such an alternative.

In sum, to review the record of Mr. Hinckley's therapy and conduct since his confinement, as well as his current diagnosis, and conclude still that opportunities for media contact and increased notoriety might not have an adverse impact upon the treatment of his personality disorder would be clearly wrong.[29] The very thirst for public attention which sparked this motion is the primary symptom of Mr. Hinckley's continued need for carefully structured treatment. To hold otherwise would be to subordinate this man's special need for rehabilitation and the state's legitimate desire and responsibility to promote that goal to public curiosity and news media interests which are unrelated to the purposes of Mr. Hinckley's commitment.

Therefore, on the facts before it, the Court concludes that Directive 89 embodies a reasonable and constitutionally valid treatment decision with regard to Mr. Hinckley alone. Because the directive, as applied to Mr. Hinckley, does not transcend constitutional bounds, the Court does not reach the broader and more suspect issue of whether the directive is impermissibly broad as applied to the John Howard population generally.[30]

## C. The Fourteenth Amendment Claims

The Court finds defendant's allegations of Fourteenth Amendment due process and equal protection violations to be without merit. The due process claim focuses upon the availability of less restrictive alternatives to Directive 89. *See* Def. Brief III at 9. Given the discussion of that issue in the context of the First Amendment claim, fur-

ther elaboration is unnecessary. The method selected is justified by policy considerations and was not arbitrarily or capriciously chosen.

The equal protection claim advances a few instances of supposedly selective enforcement of the directive to support a charge of "disparate and prejudicial treatment." Def. Brief I at 2. These claims are neither compelling nor, upon consideration of rebuttal evidence, creditable. CMHS's evidence established that no live media interviews have been allowed for maximum security patients since the adoption of Directive 89, and possibly for quite some time earlier. It also supported the conclusion that the only exceptions to the policy have been to allow the entry of authors writing articles designed for educational purposes who did not focus on the affairs or statements of individual patients, and which resulted in media intrusions of no greater magnitude than the intrusions occasioned by periodic professional evaluations. No creditable evidence supported a conclusion that the directive has not been enforced uniformly and fairly.

## IV. *Conclusion*

The Court afforded the defendant a hearing of his rather serious allegations against St. Elizabeths because the Court felt that the nature of these claims and the requirements of due process overcame the substantial treatment concerns surrounding even such a temporally and procedurally limited public discussion of these issues. However, for the reasons set forth above, the Court will not, at this time, interfere with the reasonable treatment decisions of Mr. Hinckley's treatment team. Because

---

**29.** The *Pell* Court held that, in the prison setting, considerations of what forms of personal contact might promote or impede individual rehabilitation and institutional security "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." 417 U.S. at 827, 94 S.Ct. at 2806. Having approved application of this policy under the more precise *Abbott* analysis, the Court is satisfied that it also meets the *Pell* standard.

**30.** Given the narrow issue presented and the limited record before the Court, a more general ruling would exceed the Court's authority. The Court will note merely that individualized treatment decisions or a mandatory treatment team review under the policy might comport more closely with analogous precedent. *Cf. Abbott,* 109 S.Ct. at 1883 ("individualized nature of the determinations required by the regulation" figured prominently in Court's approval of a regulation limiting prisoners' constitutional rights).

Directive 89, as applied to Mr. Hinckley, is reasonably related to legitimate therapeutic and institutional interests, the defendant's motion is denied.