Edwin C. WEST, Plaintiff-Appellant,†

v.

Phil MACHT, Louis Francart, and Deapak Dogra,
Defendants-Respondents.

Court of Appeals

*No. 99–1710. Submitted on briefs February 10,
2000.—Decided March 22, 2000.*

## 2000 WI App 134

(Also reported in 614 N.W.2d 34.)

†Petition to review denied.

On behalf of the plaintiff-appellant, the cause was submitted on the brief of *Edwin C. West*, pro se.

On behalf of the defendants-respondent, the cause was submitted on the brief of *Jody J. Schmelzer*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Brown, P.J., Nettesheim and Anderson, JJ.

¶ 1. ANDERSON, J. This appeal considers whether an involuntarily committed patient's living unit reassignment was conducted in a constitutionally permissible manner. Appealing from an order of the circuit court granting summary judgment against him, Edwin C. West argues that he was reassigned to a different living unit in retaliation for assisting other patients in filing grievances. He submitted a civil rights claim against Phil Macht, Louis Francart and Deapak Dogra, alleging that they violated his right to petition the government found in the United States and Wisconsin Constitutions and WIS. STAT.

§ 51.61(1)(u) (1997–98).[1] We agree with West that he has a constitutionally protected liberty interest under the Due Process Clause. However, we determine that the defendants interfered with this interest in a reasonable manner based on their professional judgment. Because we find no due process violation, we affirm the order granting summary judgment.

## BACKGROUND

¶ 2.  West is involuntarily committed to the Wisconsin Resource Center (WRC) to receive treatment for being a sexually violent person.[2] On August 7, 1998, a disturbance occurred involving several patients in West's unit. Three patients refused to return to their rooms for a shift change, and Dogra, a psychiatric care supervisor at WRC, responded, trying to talk the patients into returning to their rooms. The scene escalated when the resisting patients began pounding and kicking on the room doors in an attempt to get other patients involved. Dogra observed West pounding his fists and kicking on his room's door while swearing in a hostile manner. The disturbance ended by the resisting patients being removed from the unit.

¶ 3.  A few days later, West was approached by several patients in his unit regarding their concerns about the disturbance. Seeking to prove that the resisting patients were assaulted and abused by the WRC staff, West began to gather statements from

---

[1] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

[2] According to WIS. STAT. § 980.06(1), a person determined to be "sexually violent" by the court is committed to the Department of Health and Family Services (DHFS) custody for "control, care and treatment" until he or she is no longer sexually violent.

other patients. Because of his previous litigation work, West believed that the staff was carefully watching him, so he spoke with the patients individually and discreetly.

¶ 4. At one point during the day, while West was discussing the disturbance with a fellow patient in the dayroom, he became aware that a nearby WRC staff member was listening in on their conversation and looking directly at them. West quickly changed the conversation topic. Later the same day, West accused this staff member of disrespecting him by almost hitting him with a door as she left an office. The staff member noted the exchange in West's progress notes. As she described the situation, she felt West was angry about the August 7 disturbance and was "now trying to retaliate and instigate other patients against staff and [was] trying to stir up unit climate." An incident report (Report One) was filed.[3]

---

[3] We acknowledge that West disputes the characterization of many facts surrounding this and the other events that transpired and led to the issuance of incident reports. Under a usual situation, when a court reviews a motion for summary judgment, all the inferences that can be drawn from the facts are to be viewed in the nonmoving party's favor. *See Kraemer Bros. v. United States Fire Ins. Co.*, 89 Wis. 2d 555, 567, 278 N.W.2d 857 (1979). In this case, however, West is precluded from contesting these facts because he failed to raise such factual disputes after the Review of Management Status decision. *See Lindas v. Cady*, 183 Wis. 2d 547, 561, 515 N.W.2d 458 (1994) (party may be precluded from propounding a factual dispute previously determined in an unreviewed state agency decision). The incident reports were evaluated and relied upon in the Review of Management Status decision that transferred West to high management status. West could have appealed that decision and challenged its factual basis, but he chose not to. Instead, he signed the waiver of status review on the Review of Manage-

¶ 5. About an hour later, West was observed encouraging other patients in the dayroom to write reports about the August 7 disturbance. As the WRC staff detailed in another incident report (Report Two) that was subsequently filed against West,[4] West made statements that it was a felony for the staff to assault a patient and that the staff thought it was funny when a patient got beat up. Dogra confronted West at the scene. West claimed that he was only performing legal work by getting statements from other patients about the disturbance. Dogra claimed that an angry West told him that he would sue him for his part in the August 7 disturbance. Dogra requested that West stop instigating the other patients, and West assured him that he would comply.

¶ 6. West returned to his room and prepared a notice of injury and claim for one of the patients involved in the August 7 disturbance. This patient had been placed in seclusion, so West mailed the notice to the other patient via the regular mail.

¶ 7. The next day, a WRC treatment team met to review the August 7 disturbance in accordance with WRC policy. As a part of this meeting, the treatment team also reviewed West's incident reports. Dogra and Francart, also a WRC psychiatric care supervisor, participated in the team's decision to temporarily reassign West to a high management unit. The WRC's rules

---

ment Status decision. Because West had the opportunity to further litigate any factual disputes before the agency but declined to do so, we give preclusive effect to the agency's fact-finding. *See id.* Therefore, we will rely on the factual circumstances described in the incident reports.

[4] This incident report also documents a WRC staff member's observation of West's behavior during the August 7 disturbance.

provide that if a patient is suspected of major misconduct, staff may temporarily reassign the patient to the high management unit pending an investigation of the patient's conduct. The reassignment must be reviewed within seventy-two hours to consider the patient's management and treatment needs. The WRC director documents the team's reasons for its decision on the Review of Management Status form, from which the patient may seek review. As the team indicated in the Review of Management Status form drafted by Francart, the team decided to permanently transfer West to high management status because of his major misconduct in the August 7 disturbance and behaviors described in the other incident reports. Although patients are permitted five days to seek the director's review of the decision, West signed the waiver of status review portion of the form.

¶ 8.   Later that day when the WRC staff sorted the mail, West's letter to his fellow patient containing the notice of claim was held by the staff because West was under investigation for the August 7 disturbance. The staff member documented the mail withholding and informed West. Mail from West to a different patient was also held for the same reason a few weeks later.

¶ 9.   The next month, West filed a civil rights claim against Dogra, Francart and Macht, WRC's director, requesting damages and declaratory relief. In his complaint, West alleged that he was transferred to the high management unit in retaliation for his legal assistance to others. He argued this violated his patient rights as set forth in WIS. STAT. § 51.61 and WIS. ADMIN. CODE § HFS 94 as well as his civil rights provided in the First and Fourteenth Amendments to the United States Constitution.

¶ 10. The parties filed competing motions for summary judgment. The court granted the defendants' motion because it determined that West's unit reassignment was based on his behavior problems that were documented in the incident reports issued by WRC staff. West appeals.

## DISCUSSION

¶ 11. West maintains his conspiracy theory on appeal. Central to this theory is his belief that because he was assisting other patients to contest the August 7 disturbance, he was set up by WRC staff through backdated incident reports to justify his transfer to the high management unit. He raises numerous issues contending that the summary judgment grant was erroneous. In brief, he argues that the court wrongly dismissed these issues on summary judgment—his claim that a constitutional violation occurred and his claims of violations of his patient rights under WIS. STAT. § 51.61.

¶ 12. We review an order granting summary judgment using the same methodology as the circuit court. A motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2).

¶ 13. We begin our review by examining the complaint to determine whether it states a claim and then the answer to determine whether it contains a material issue of fact. *See Schaidler v. Mercy Med. Ctr., Inc.*, 209

Wis. 2d 457, 464, 563 N.W.2d 554 (Ct. App. 1997). If each does, our next step is to examine whether the moving party's documents establish a prima facie case for summary judgment. *See id.* at 464–65. If a prima facie case is established, we examine the opposing party's documents and search for any disputed material facts that would entitle the opposing party to a trial. *See id.* at 465.

## A. *Constitutional Violation*

¶ 14.    West invokes 42 U.S.C.A. § 1983 (West 1994)[5] to pursue his constitutional claim. Section 1983, in and of itself, does not create substantive constitutional rights; rather, it provides a remedy for the deprivation of rights established elsewhere. *See Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617–18 (1979). When claiming a violation of substantive due process, one must show the deprivation of a constitutionally protected interest in life, liberty or property. *See Staples v. Young*, 149 Wis. 2d 80, 83, 438 N.W.2d 567 (1989). Liberty interests may arise under either federal or state law. *See id.* at 84.

¶ 15.    West claims that he was punished by the defendants in violation of the Fourteenth Amendment for exercising his First Amendment right to petition

---

[5] In relevant part, 42 U.S.C.A. § 1983 (West 1994) provides:

   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

the government for the redress of grievances.[6] The right of individuals to petition the state and federal governments is protected in both the United States[7] and Wisconsin Constitutions.[8] *See City of Madison Joint Sch. Dist. No. 8 v. WERC*, 69 Wis. 2d 200, 210, 231 N.W.2d 206 (1975). In addition, WIS. STAT. § 51.61(1)(u) provides that mental health patients "[h]ave the right to present grievances . . . on his or her own behalf or that of others . . . without justifiable fear of reprisal." Section 51.61(5)(d) states that "[n]o person may intentionally retaliate or discriminate against any patient . . . for initiating, participating in, or testifying in a grievance procedure." Hence, the right to petition

[6] The defendants frame the issue as whether West has a state-created liberty interest in a specific unit assignment. We do not think that phrasing adequately conveys what West is arguing. Because West is a pro se litigant, we will interpret his pleadings in a liberal fashion. *See State ex rel. Terry v. Traeger*, 60 Wis. 2d 490, 496, 211 N.W.2d 4 (1973). We construe West's claim to be that the defendants' act of reassigning him to the high management unit was in retaliation for his exercise of his First Amendment right to file grievances. He also asserts, however, a state-created liberty interest. West argues that WIS. STAT. § 51.61(1)(u) and (5)(d) together create a liberty interest to file grievances without retaliation.

[7] The First Amendment to the United States Constitution proscribes: "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. CONST. amend. I. The Fourteenth Amendment prohibits state governments from depriving their residents of life, liberty or property without due process of law. *See* U.S. CONST. amend. XIV.

[8] The Wisconsin Constitution provides in article I, section 4:

**Right to assemble and petition.**SECTION 4. The right of the people peaceably to assemble, to consult for the common good, and to petition the government, or any department thereof, shall never be abridged.

the government is clearly a constitutionally protected interest. As such, it is not extinguished because a person is involuntarily committed. *See United States v. Hinckley*, 725 F. Supp. 616, 625 (D. D.C. 1989).

¶ 16. At the outset, we note that our analysis of this case is different from that taken by the parties. Both parties argue their positions from case law defining the rights and liberties of the criminally confined. *See, e.g., Sandin v. Connor*, 515 U.S. 472 (1995). Although West did serve a criminal sentence, his placement at WRC pursuant to WIS. STAT. ch. 980 is of a civil nature. *See State v. Post*, 197 Wis. 2d 279, 294, 541 N.W.2d 115 (1995). As West correctly argues, he is considered a patient under the Mental Health Act. *See* WIS. STAT. § 51.61(1). We determine that his situation is more akin to cases discussing the constitutional rights of those under state authority because they have been involuntarily committed for mental health issues. The seminal case on this topic is *Youngberg v. Romeo*, 457 U.S. 307 (1982).

¶ 17. In *Youngberg*, the Supreme Court recognized that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321–22. Although the involuntarily committed are not deprived of their constitutional rights, their rights are not absolute. *See id.* at 319–20. The Court acknowledged that these rights might at times be infringed in order to serve other predominating governmental interests. To be lawful, the restriction on the involuntarily committed's constitutional rights must be reasonably related to legitimate therapeutic and institutional interests. *See id.* at 322. Such interests might

include the orderly administration of the facility, the security of patients, visitors and staff, and the therapeutic goals of all the patients.

¶ 18. In light of the medical and scientific uncertainties involved in the mental health setting, courts show deference to mental health professionals' judgment because they have the necessary education and training to make therapeutic decisions. *See Hinckley*, 725 F. Supp. at 628. Therefore, when we determine the reasonableness of a substantive right infringement, we defer to the mental health professional's judgment regarding the appropriate treatment decision for the patient. *See Youngberg*, 457 U.S. at 322–23. We make certain that professional judgment was exercised but give the professional's decision presumptive validity. *See id.* at 323. "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.*

¶ 19. The WRC has created rules "to assure safety and security in an environment that facilitates treatment" and has provided a copy of them to each of its patients. As long as its rules are reasonably related to legitimate therapeutic and governmental interests, the WRC may create and impose rules necessary to ensure a safe environment for its patients and staff. *See Hinckley*, 725 F. Supp. at 629.

¶ 20. According to the WRC rules, a patient can be sanctioned or disciplined for failing to follow the institution's rules. West argues that his actions in assisting fellow patients to file grievances for the August 7 disturbance led to his unit reassignment. The

WRC rules governing such conduct are found under the heading Legal Services. There, the rules provide:

> Patients may provide legal assistance to other patients within their immediate living unit. Patients may *not* charge a fee, or receive any other form of compensation for these services. The Ping Pong Room should be utilized for these meetings. Patients should inform staff to ensure no interruptions during this time (limit—two patients at a time).

¶ 21.  We determine, and the parties do not contest, that the WRC rules governing legal services are based on legitimate institutional concerns. The legal services rule sets out the procedure and parameters for patients to exercise their right to assist others with filing their grievances. To exercise his right, West was required to exercise it in accordance with the rules the WRC created to ensure the safe and efficient operation of the center. The record in this case reveals that West failed to do so.

¶ 22.  Prior to receiving Report One, West was discussing the August 7 disturbance with another patient in the dayroom. Similarly, when West was gathering statements from other patients about the disturbance immediately before receiving Report Two, he was also in the dayroom. He did not request to meet with others in the ping pong room as the rules required.[9] Additionally, West did not inform the WRC staff that he was providing legal assistance and should not be disturbed. Because West did not follow the WRC rules to exercise his right, it was not clear to the staff

---

[9] At that time, a ping pong room was not available for West's unit. The Patient Handbook provides that West could have used the law library for his activities instead.

that he was engaging in legal services work. As evidenced in Reports One and Two,[10] it appeared to WRC staff that West was not providing legal assistance to other patients, but instead was encouraging and instigating the other patients in his unit to write reports about the disturbance. At the time, the unit's staff was understandably focused on regaining a calm environment after the disturbance, and to the contrary, West was focused on stirring up hostility toward the staff. The staff interpreted West's behavior as having a negative effect on the safety and treatment of others; therefore, he was disciplined. His discipline was done in accordance with the WRC rules.

¶ 23. Later, the treatment team met and reviewed West's situation. He was temporarily reassigned to the high management unit.[11] Although West

---

[10] West argues that his actions were written up in incident reports before the staff documented the actions in his progress notes. He claims that staff wrote backdated entries in his progress notes and alleges through a handwriting expert witness's report that staff members altered each other's notes. But, West points to no WRC rule stating that incident reports and progress notes must be recorded immediately following the event. Staff members have many duties and are not required to perform their administrative duties within a specified time frame. Furthermore, West's progress notes and incident reports were written after WRC staff investigated and met to review the August 7 disturbance. This explains why West's actions were documented on a later date and why staff members altered or finished another staff member's thoughts in the notes.

[11] West also claims that WRC staff failed to follow its own rules because Francart did not interview him before reassigning him to high management status. Francart admits to not interviewing West before informing him of his temporary reassignment; however, Francart argues that the rules do not

views his reassignment as punishment, a reassignment can accomplish several goals. Admittedly, a reassignment may serve as discipline, but it can also place patients in the appropriate environment so that they can reach their therapeutic goals. The treatment team not only addresses the issue of managing the patient but also develops a "cross-unit plan to facilitate the patient's treatment." Utilizing their education and collective experience, the team members determined that West's treatment and the safe and efficient operation of the center would best be achieved by permanently reassigning him to a high management unit. This decision was a valid exercise of professional judgment and was not retaliatory in purpose. For the reasons set forth above, this court will not interfere with the reasonable decisions of West's treatment team.

## B. WISCONSIN STAT. § 51.61 Claims

¶ 24.   Next, West insists that the defendants violated eight of his patient rights, some of which are: his right to the least restrictive conditions, his right to a humane psychological and physical environment, his right to be informed of his treatment, his right to be treated with respect and his right to receive prompt

---

require a patient interview when he or she receives a temporary reassignment to high management. During the temporary reassignment, the treatment team reviews the patient's case and decides whether a permanent status transfer is appropriate. Before a permanent status transfer can be done, the WRC rules require that "[t]he Team must interview the patient and consider his [or her] proposals to better manage his [or her] behavior in the future before the patient can be reassigned." Francart correctly argues that a patient interview is not required prior to a patient's temporary reassignment.

and adequate treatment. *See* WIS. STAT. § 51.61(1)(e), (f), (fm), (m) and (x). All of these claims are founded on West's argument that his reassignment to the high management unit was unconstitutional. Because we have already concluded that the reassignment was a reasonable treatment decision, these claims are without merit. As for West's remaining allegations, we have already addressed the claims under § 51.61(1)(u) and (5)(d) and concluded that no violations occurred. We choose to address in detail only one of West's claims—that his right to send mail was violated. *See* § 51.61(1)(c).

### C. *Withheld Mail*

¶ 25. WRC staff intercepted two letters mailed by West to other patients because he was under investigation for his actions in the August 7 disturbance. West contends that the circuit court erred by determining that the withholding of these letters was lawful. He claims that holding his mail violates the patient rights detailed in WIS. STAT. § 51.61(1)(c) and WIS. ADMIN. CODE § HFS 94.19.

¶ 26. DHFS patients have a "right to send sealed mail and receive sealed mail to or from other persons, subject to physical examination in the patient's presence if there is reason to believe that such communication contains contraband materials . . . which threaten the security of patients, prisoners or staff." WIS. STAT. § 51.61(1)(c). Officers and staff are prohibited from reading all mail. *See id.* This section is incorporated into DHFS's regulations in WIS. ADMIN. CODE § HFS 94.19(1).

¶ 27. Nevertheless, a patient's right to send mail is not absolute. WISCONSIN ADMIN. CODE § HFS 94.05(2) permits a patient's right to be denied or limited for good

cause when the facility's director "has reason to believe the exercise of the right would create a security problem . . . or seriously interfere with the rights or safety of others." We determine that good cause was present and justified the denial of West's right to send mail.

¶ 28. Both of the letters that were not delivered were addressed to patients in seclusion because of their activities in the August 7 disturbance.[12] Because West's conduct in the disturbance was under investigation, it follows that the defendants had good cause not to deliver the letters to other disturbance participants. The disturbance created a safety and security risk to the patients, and by communicating with the other actors in the disturbance, West could have continued fostering an impermissible safety and security risk. Consequently, we resolve that no statutory or code violations occurred.

¶ 29. In summary, we conclude that the summary judgment grant was proper. Despite West's allegations of retaliatory treatment, the record reveals that his unit reassignment was a reasonable treatment decision of West's treatment team and a proper exercise of the team members' professional judgment. Accordingly, his constitutional claims fail. We likewise determine that West's patient rights claims do not have merit. After a thoughtful consideration of West's

_____

[12] West states that both letters "contain a notice of injury and claim that must be filed within 120 days on the attorney general or the defendants could not be sued." In other words, West is confessing that he was trying to provide legal services for patients in different units from his own. The WRC rules do not permit this. Patients are only permitted to provide legal assistance to other patients "within their immediate living unit."

arguments, we affirm the circuit court's determination that the defendants are entitled to judgment as a matter of law.

*By the Court.*—Order affirmed.